J-S14033-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: H.H., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.H., FATHER | : : : : : : | |
| | : | No. 42 WDA 2023 |

Appeal from the Decree Entered December 6, 2022
In the Court of Common Pleas of Indiana County Orphans' Court at
No(s): No. 32-22-0364

BEFORE: PANELLA, P.J., BENDER, P.J.E., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                    **FILED: June 8, 2023**

M.H. (Father) appeals from the decree entered in the Court of Common Pleas of Indiana County (trial court) granting the petition of Indiana County Children and Youth Services (CYS) to involuntarily terminate his parental rights to H.H. (d/o/b March 2020) (Child) pursuant to the Adoption Act, 23 Pa.C.S. § 2511 (a)(8) and (b).[1] Counsel has filed an amended application to withdraw and brief pursuant to **Anders v. California**, 386 U.S. 738 (1967). We affirm the decree and grant counsel's application to withdraw.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] R.E. (Mother) voluntarily executed a consent to adoption of Child and is not a party to this appeal.

**I.**

We glean the following facts from the certified record. CYS took protective custody of Child in May of 2020 and he has remained in foster care since that time. The trial court held regular permanency review hearings thereafter to assess Father's progress on his reunification goals, which primarily related to drug and alcohol treatment, mental health treatment and parenting classes. In May of 2022, CYS filed a petition to terminate Father's parental rights, arguing that he had made minimal and insufficient progress toward his goals.

The trial court held a hearing on the petition in November of 2022. Dr. Carolyn Menta, a clinical psychologist, testified as an expert regarding bonding assessments she conducted with Father and Mother and with Child's foster family. She began Father's bonding assessment on March 11, 2022, but could not complete the assessment because he did not return to her office for a second day of testing. Her office attempted to contact Father multiple times but he did not respond. On the first day of testing, she observed Father with Child for approximately one hour and conducted a clinical interview. He completed the Child Abuse Potential Inventory (CAPI) assessment but did not complete the Personality Assessment Inventory (PAI).

Dr. Menta testified that during the observation portion of the assessment, Father was attentive to Child but did not read Child's cues well. She described his behavior as "hypomanic" and said that he tried to

continuously engage Child in activities rather than letting him settle into activities that interested him.  N.T., 11/1/22, at 10.  She was concerned that Father was unable to read Child's cues because Child was two years old at the time of the assessment and had a limited ability to communicate his needs. She concluded that there was a bond between Father and Child but characterized it as an "insecure attachment."  *Id.* at 11.  Child seemed comfortable with Father but did not initiate much affection.  She described an insecure bond as one in which "the child may not feel totally at ease, may not feel that [the] parent is consistently available to them and consistently meeting their needs."  *Id.*

Dr. Menta testified that she was concerned that Father did not complete the PAI because it would allow her to assess his mental health and attachment, his personality and his level of investment in the process.  She had assessed Father in October of 2020 and recommended mental health treatment at that time.  At the assessment in 2022, he reported that he had received mental health treatment and she wanted to compare how he had responded to that treatment in the intervening time.  She was unable to assess his progress because he did not complete the test.

Ultimately, Dr. Menta recommended that Father's parental rights be terminated because he had been inconsistent with following through on treatment and with forming a bond with Child.  She believed that Child had a

very secure bond with his foster parents and believed the benefits of remaining with that family outweighed any risks associated with termination.

Dr. Menta performed a bonding assessment with the foster parents and observed them with Child and two foster siblings. She said that the foster parents were engaged but not overbearing, and that Child was comfortable approaching them throughout the session to interact or show affection. Child could separate from the foster parents without distress. She considered all of this as evidence of a secure bond, which she described as "when a child feels complete trust that [the] parent is going to consistently be there for them . . . and [t]he child feels confident enough to explore and exercise some independence instead of feeling like they have to stay right by that parent." *Id.* at 15-16.

Dr. Menta said that the foster parents' CAPI and PAI assessments revealed a level of guardedness in their responses that is "not unexpected" in custody cases. *Id.* at 16. She believed the guardedness was reflective of their more traditional values regarding the family and household, which they expressed in the interview. She did not consider that factor to be negative and opined that they had "a very healthy household." *Id.* at 17. She concluded that it was in Child's best interests to remain with the foster family, as he had formed a strong bond with the foster parents and siblings.

On cross-examination, Dr. Menta testified that her office had called Father three times about completing the assessment and that she was not

aware of whether he was ever turned away by the office after attempting to complete the testing. She said that Child expressed excitement at seeing Father during the assessment, and that Father and Mother brought some of Child's toys to the meeting. She said that Child would look back at Father and Mother for reassurance before interacting with her during that portion of the assessment, which she interpreted as looking for assurance of his safety. He did not exhibit that behavior in the bonding assessment with the foster family. She said that Child was comfortable with Father and that he behaved appropriately but was a little overbearing. She said it was possible that Father was nervous about the assessment.

Dr. Menta said that she was concerned that Father had not been consistent with his drug and alcohol treatment or mental health treatment and that he was unable to read Child's cues. She testified that it is possible for parents to develop bonds with children and learn to read their cues even with limited weekly visitation. She said that Child may experience some sadness if Father's parental rights were terminated, but she did not anticipate any long-term harm due to his young age. She further testified that if Father did not see Child for several months after the bonding assessment, any bond that existed at that time may have diminished.

Vicki Weaver, a CYS program specialist and caseworker, testified next. She testified that Child had been placed with his foster family since May of 2020 and that it was a safe environment. At two years and seven months old,

Child had spent approximately two years and four months of his life in foster care. She had observed Child in the foster home and agreed with Dr. Menta that he had a strong bond with the foster family. He called the foster parents "mom and dad." *Id.* at 26. The foster parents were prepared to adopt Child if Father's parental rights were terminated. In terms of developmental milestones, Child had been lagging and attended occupational and speech therapy until September of 2022. He had been successfully discharged from those programs, was currently on target for all milestones and was receiving appropriate treatment for some medical issues.

Weaver testified that Child was taken into protective custody in May of 2020 due to concerns regarding housing and drug use by Father and Mother. When CYS staff arrived at the home, Father refused to allow them in or take a drug test. The "[s]ituation escalated," Father was arrested and Child was placed in foster care. *Id.* at 29. Following the dependency adjudication, Father was directed to complete a parenting program, mental health treatment, drug and alcohol treatment and the Seeking Safety program through JusticeWorks.

Father completed the required parenting classes by early 2021, though he struggled with inconsistent attendance in the beginning. He did not complete the Seeking Safety program. Father and Mother worked with JusticeWorks through December of 2021, but the agency notified CYS in early 2022 that the parents were not consistent with arrival and drop-off times for

visitation. After speaking with the parents about these issues, they returned to a supervised visitation schedule through JusticeWorks.

For mental health treatment, Father began with the psychological evaluation with Dr. Menta in October of 2020. She recommended that he continue drug and alcohol treatment, have a psychiatric evaluation and see an individual therapist. Father did not complete the psychiatric evaluation for a full year. He began therapy and was inconsistent with attendance, losing contact with the facility entirely in April of 2022. Weaver said that Father had on at least four occasions participated in a drug and alcohol assessment or received services, only to be discharged by the program. He had last seen the drug and alcohol program in September of 2021.

Father had shown some cooperation with his requirements early in the dependency proceedings and CYS increased his visitation time with Child as a result. He began seeing Child twice a week for two hours of supervised visits, which was increased to three and then four hours unsupervised twice a week. In December of 2021, Father and Mother had eight hours of unsupervised visitation per week. At that time, there were some concerns about tardiness, attendance and inconsistent housing. Weaver said that Father and Mother had appropriate apartments but would move approximately every six months. Nevertheless, at that time, CYS was still moving toward reunification.

In early 2022, however, JusticeWorks reported that Father and Mother were not compliant with the Seeking Safety program, that they were in danger

of eviction, and that they had concerns about their mental health and Mother's potential drug use. At a meeting with both parents in February of 2022, Mother admitted that she had relapsed and claimed that Father had as well. CYS reinstated the supervised visitation, directed both parents to comply with treatment recommendations and asked them to complete hair follicle drug tests. Father tested negative for drugs on the day of the meeting but never took a hair follicle test. Since that time, CYS was unable to confirm whether Father had continued drug and alcohol treatment.

In September of 2022, just before the first scheduled date for the termination hearing, Weaver learned that Father had admitted himself into SpiritLife, a rehabilitation facility. He was still in the program at the time of the hearing. Regarding mental health services, Weaver reiterated that Father did not complete the bonding assessment with Dr. Menta and had ceased attending therapy in early April of 2022, shortly before CYS filed the termination petition. She had never received any confirmation that Father had restarted his mental health services.

Weaver said that after her meeting with Father and Mother in February of 2022, they were scheduled for two hours of supervised visitation with Child per week. They attended the visits but had continued issues with tardiness. Father and Mother stopped attending entirely after May 11, 2022, even though two additional weeks of visits were already scheduled. Father had not seen Child since that date. Weaver had one conversation with Father after he had

checked himself into SpiritLife, but he otherwise did not respond to any of CYS's attempts to contact him by letter, phone or through his sister.[2]

Based on this history, Weaver opined that the concerns that CYS had regarding Father's drug and alcohol use, mental health and inconsistent housing had persisted in the case. He had not consistently attended or complied with drug and alcohol treatment. He claimed to have been sober since 2016 but tested positive for fentanyl in 2020. While he was receiving inpatient treatment at the time of the hearing, it had taken two-and-a-half years for him to follow through with that service. He struggled with anxiety but did not follow up on medication recommendations and stopped therapy in April of 2022. Weaver also did not know where Father and Mother had been residing since May of 2022, as they did not provide updated contact information to CYS and had been evicted multiple times in the history of the case. Weaver recommended that Father's parental rights be terminated and that Child remain with his foster family.

On cross-examination, Weaver testified that Father had been receiving Suboxone treatment but she did not have a current release to obtain any records after 2022. She admitted that he had initially been making progress

---

[2] Weaver spoke with Father's two sisters while conducting family finding efforts. Neither was available as an adoptive resource. Weaver testified that if a family member came forward with an interest in adopting or being a part of Child's life, CYS would investigate the resource or connect them with the foster family.

toward reunification, but said that it was inconsistent and the efforts began "falling apart" in December of 2021. *Id.* at 44. She said that Father intended to move into a halfway house after completing his program at SpiritLife. She confirmed that based on her observations, Father loves Child and Child is comfortable with him. She remained concerned about his ability to care for Child given his inconsistency throughout the dependency case. When she spoke to him while he was at SpiritLife, he said that the foster family seemed like "a good Christian family," he was happy that Child was with them, and he did not request any visitation rights. *Id.* at 45. She also testified that during the pandemic, all recommended services were available through telehealth.

Finally, Father testified on his own behalf. He had been residing at SpiritLife since October 5, 2022. He said that after Child was born, Mother suffered from postpartum depression and he handled all the childcare after he returned home from work. He had been employed as a part-time pizza delivery driver and maintained that job until March of 2022. He said he did not deny CYS entry to the home on the day they took protective custody of Child, and that Mother had recently relapsed at that time. He testified that he complied with the service recommendations that were put in place when dependency was initiated. He claimed that he returned to Dr. Menta's office to complete the bonding assessment in March of 2022, but was told by her staff that he did not need to answer any further questions.

Father admitted to being five to ten minutes late for visitation with Child on occasion. He said that he had been working with the same drug and alcohol counselor for two years. He completed multiple assessments and had been unsuccessfully discharged from treatment in the past but was able to complete new intakes to restart services. In early March of 2022, he lost his job, Mother relapsed, they were homeless and there were problems with Mother's family. He was struggling with depression, anxiety and sleeping and had been prescribed Suboxone and THC. He said that the doctor who prescribed his Suboxone told him that in some cases, THC had been laced with fentanyl. Based on these life stressors, he gave up on his mental health treatment.

Father testified that he and Mother broke up in September of 2022 and that if the relationship had ended earlier, he would have been more consistent with services. He struggled to care for her during her relapses and could not focus on his own treatment goals.

Father testified that the unsupervised in-home visits with Child had gone well. He saw Child eight hours a week when he was one year old and witnessed a lot of his "firsts." *Id.* at 52. Child called him and Mother "mom and dad" at that time. *Id.* He admitted that he might have been overbearing but said that his medications were affecting him. He stopped seeing Child in May of 2022 due to covid-19 quarantine procedures as he, Mother and another household member all contracted the virus in the span of a month. He

believed Mother had contacted CYS to restart visitation and said that if he had known Mother did not contact CYS he would have reached out himself.

Father testified that he completed the Seeking Safety program with JusticeWorks. He could not recall whether that involved a parenting class but said they received certificates and gift cards for successful completion. Regarding the bonding assessment, he said he and Mother showed up for their appointment to complete the PAI ten minutes late and an assistant told them they had already answered enough questions. He said Dr. Menta never reached out to him about completing the assessment and he would have responded if she had.

Father said he only used prescription Suboxone and THC, but then immediately testified that he had last used illegal substances at the end of September of 2022, just before checking into rehab. He had been withdrawing from Suboxone when he relapsed but felt that the SpiritLife program was helping him maintain his sobriety. He said he would leave SpiritLife when he could find an opening at a halfway house, as he had previously been homeless and living in an abandoned trailer. He anticipated moving within ten days and staying at the halfway house for three to six months. He would continue attending 12-step meetings and had support from his family members. He had successfully weaned off Suboxone and intended to maintain his sobriety.

Father testified that he had family members who would be willing to adopt Child if his parental rights were terminated. His family owned a house

he could live in with Child after leaving the halfway house if he was granted custody. He said he would dedicate his life to Child and had a lot of family support for raising him. He said he did not want his parental rights to be terminated because he believed that adopted children "wonder why their parents abandoned them." *Id.* at 58. He intended to get his commercial drivers' license to be able to provide for Child.

On cross-examination, Father admitted that he never asked Mother about reestablishing visitation even though he believed she had contacted CYS about doing so. He did not ask her to follow-up because she relapsed. He said that he was disappointed by her health and lack of commitment to services. It did not occur to him to ask CYS to restart the visits when he and Mother could no longer participate together due to her relapse. He said they had been successful and sober for a year during the case, but she relapsed and he became depressed when they were not reunited in December of 2021. He agreed that he could not take custody of Child while living in the halfway house but said that he could still visit with Child during that time.

Following the reception of the evidence, the trial court granted the petition terminating Father's parental rights.[3] Father timely appealed and counsel filed a concurrent statement of her intent to file an ***Anders*** brief in

_____

[3] Child's guardian *ad litem* and legal counsel both agreed that it was in Child's best interest that Father's parental rights be terminated.

lieu of a concise statement pursuant to Pa. R.A.P. 1925(b).  *See* Pa. R.A.P. 1925(c)(4).  She subsequently filed a petition to withdraw and an *Anders* brief in this Court.

## II.

When presented with an *Anders* brief, we must first address whether counsel has properly sought to withdraw.  In *In re V.E.*, 611 A.2d 1267 (Pa. Super. 1992), this Court extended *Anders* to appeals involving the termination of parental rights.  *See id.* at 1275.  Counsel must:  1) petition the court for leave to withdraw, stating that after making a conscientious examination of the record, she has determined that the appeal would be frivolous; 2) furnish a copy of the brief to the defendant; and 3) advise the defendant that he has the right to retain private counsel or raise additional arguments that he deems worthy of the court's attention.  *In re Adoption of B.G.S.*, 240 A.3d 658, 661 (Pa. Super. 2020) (citation omitted).  We also review counsel's *Anders* brief for compliance with the requirements under *Commonwealth v. Santiago*, 978 A.2d 349 (Pa. 2009), which require the *Anders* brief:

> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and
>
> (4) state counsel's reasons for concluding that the appeal is frivolous.  Counsel should articulate the relevant facts of record,

controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Id.* (citing *Santiago*, *supra* at 361). Once counsel has submitted a compliant *Anders* brief, we will conduct an independent review of the record to discern if there are any non-frivolous issues that counsel may have, intentionally or mistakenly, omitted or misstated. *See Commonwealth v. Yorgey*, 188 A.3d 1190, 1197 (Pa. Super. 2018) (*en banc*).

Counsel has substantially complied with these procedural mandates. Counsel's brief avers that she reviewed the entire record and concluded that the instant appeal is frivolous. She served a copy of the brief and petition to withdraw on Father and attached a copy of the letter she sent to Father to her petition to withdraw. *See Commonwealth v. Woods*, 939 A.2d 896, 900 (Pa. Super. 2007) (noting that counsel must attach to their withdrawal petition a copy of the letter sent to the client). The letter informed Father that he has the right to hire private counsel or file a *pro se* brief. Father has filed a *pro se* letter in this Court, which we address *infra*.

We now examine the substantive elements of the *Anders* brief. The brief accompanying the petition to withdraw must: (1) provide a summary of the procedural history and facts with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. *See Santiago*, *supra*, at 361. Counsel's *Anders* brief summarizes the factual and procedural

- 15 -

history, identifies two potential issues, and outlines the legal and factual analysis that led counsel to conclude that any appeal would be frivolous. Because counsel has complied with the procedural and substantive requirements of **Anders**, we now "make a full examination of the proceedings and make an independent judgment to decide whether the appeal is in fact wholly frivolous."[4] **Santiago**, **supra**, at 355 n.5.

### III.

### A.

First, we consider whether there was clear and convincing evidence to establish grounds for termination under subsection 2511(a)(8).[5] "The party

---

[4] We review the trial court's decision for an abuse of discretion. **In re G.M.S.**, 193 A.3d 395, 399 (Pa. Super. 2018) (citation omitted). Moreover, "[w]e give great deference to trial courts that often have first-hand observations of the parties spanning multiple hearings." **In re Interest of D.F.,** 165 A.3d 960, 966 (Pa. Super. 2017). "We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." **In re S.H.**, 879 A.2d 802, 805 (Pa. Super. 2005). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." **In re A.S.**, 11 A.3d 473, 477 (Pa. Super. 2010). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." **Id.**

[5] CYS pled that Father's parental rights should be terminated pursuant to subsections 2511(a)(1), (2), and (8). When reviewing a trial court's order terminating parental rights, we need only agree as to one subsection of Section 2511(a), as well as Section 2511(b), to affirm the order. **In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Accordingly, like the trial court, we will focus on subsection 2511(a)(8), which allows for termination if:

seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [the subsections of 23 Pa.C.S. § 2511(a)]." *In re Adoption of J.N.M.*, 177 A.3d 937, 942 (Pa. Super. 2018) (quoting *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007)). Clear and convincing evidence is that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re D.L.B.*, 166 A.3d 322, 326 (Pa. Super. 2017) (citation and quotation marks omitted). The court may then enter a final decree of involuntary termination if it is in the child's best interests as outlined in Section 2511(b). *Id.*

Termination under subsection 2511(a)(8) does not require consideration of the parent's willingness or ability to remedy the conditions that led to the child's placement if the conditions continue to exist. *See In re Adoption of R.J.S.*, 901 A.2d 502, 511 (Pa. Super. 2006). Even if a parent has made progress in remedying the conditions and could potentially parent the child successfully in the future, termination is justified if the conditions continue to

---

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

exist after 12 months in placement and it would serve the needs and welfare of the child. *In re S.H.*, 879 A.2d 802, 806-07 (Pa. Super. 2005).

The record supports the trial court's conclusion that there was clear and convincing evidence to support termination under subsection 2511(a)(8), and any appeal of that determination is wholly frivolous. After two years in foster care, the conditions that led to Child's placement had persisted and Father remained unable, by his own admission, to resume fulltime parenthood. At the time of the hearing, Father was residing in an inpatient rehabilitation facility that he had entered after a relapse approximately one month prior. He had tentative plans to obtain a commercial driver's license and live in a halfway house for three to six months, a housing situation that he admitted precluded him from exercising full custody of Child. While he spoke in general terms of having family members who would help him care for Child, he was currently unable to do so and his timeline for exercising full custody would have resulted in Child spending approximately three years in foster care.[6]

The record reveals that Father was making moderate progress toward reunification until approximately December of 2021, five months before CYS

---

[6] Moreover, while it is admirable that Father sought inpatient treatment following his relapse, "[w]ith respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S. 2511(b).

filed the termination petition. Those moderate efforts over the first year-and-a-half of placement included completing parenting classes, getting a psychiatric evaluation, and undergoing four drug and alcohol evaluations, some of which ultimately resulted in unsuccessful discharge from his program. He had housing but would have to move frequently and sometimes faced eviction. He and Mother participated in the Seeking Safety program with JusticeWorks, but did not complete it and struggled with tardiness during their periods of visitation. By December of 2021, he was able to exercise eight hours of unsupervised visitation per week but no overnight custody.

Soon thereafter, Father and Mother both began to backslide on any progress that had been made. JusticeWorks notified CYS that they were increasingly struggling with tardiness during their scheduled visits and were facing eviction. At a meeting in February, Mother admitted to relapsing and Father produced a negative drug test but failed to comply with the request for a hair follicle drug test. He did not follow up on medication recommendations from his mental health provider, stopped attending therapy in April of 2022, and stopped attending visits with Child in May of 2022 before CYS filed the termination petition. He claimed he believed Mother had contacted CYS about restarting visitation but did not take any steps himself to reestablish contact with Child. CYS attempted to contact him through multiple avenues but he never responded. At the time of the hearing, he had not seen Child for approximately six months.

Thus, despite moderate efforts to achieve the goals set out for him by CYS, Father was still not able to parent Child on a full-time basis when CYS filed the termination petition after two years of Child's placement. His progress in some areas did not alleviate all the conditions that led to Child's placement. ***See S.H., supra***. Moreover, as we address *infra* in our analysis of Section 2511(b), terminating Father's parental rights will best serve Child's needs and welfare. Accordingly, CYS presented sufficient evidence to support termination under subsection 2511(a)(8) and any argument to the contrary is wholly frivolous.

### B.

Next, we consider whether the termination is in the best interests of Child under Section 2511(b).[7] There are several factors to consider in this analysis:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional

---

[7] 23 Pa.C.S. 2511(b) provides:

> Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

needs and welfare of the child. . . . While a parent's emotional bond with his or her child is a major aspect of . . . [S]ection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015); *In re M.Z.T.M.W.*, 163 A.3d 462, 464 (Pa. Super. 2017). It is sufficient for the court to rely on the opinions of social workers and caseworkers when evaluating the impact that termination of parental rights will have on a child. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *Id.*

Moreover, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citation omitted). The court may consider intangibles such as the love, comfort, security and stability the child might have with the foster parent. *See In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011). Ultimately, the concern is the needs and welfare of the child. *In re Z.P.*, *supra* at 1121.

The record amply supports the trial court's conclusion that terminating Father's parental rights serves Child's best interests. As the trial court explained, the bonding assessments Dr. Menta performed with Father and the

foster family demonstrate that Child is more securely attached to his foster parents, who he has lived with for almost his entire life. His behavior demonstrated a level of trust and comfort in his foster parents that was not present in the bonding assessment with Father. While Dr. Menta believed that Child was comfortable in Father's presence, his behavior suggested an insecure attachment to Father, and he sought reassurance more frequently during Father's bonding assessment. Dr. Menta was concerned that Father struggled to read Child's cues, even though she considered this to be a skill parents can develop with limited periods of visitation. She opined that Child would benefit from the permanency and security that would come from terminating Father's parental rights.

In contrast, Child demonstrated a secure attachment with foster parents and played well with his foster siblings during their assessment. He was comfortable and showed affection, particularly with his foster mother. He had lived with the family for over two years and developed a strong bond with them. They had sought medical treatment for him when necessary and had taken him to speech and occupational therapists to ensure that he was meeting developmental milestones. The record reveals clear and convincing evidence that termination of Father's parental rights is in Child's best interests. This issue is wholly frivolous.

## C.

Next, we turn to the letter Father filed on his own behalf in this Court

on February 16, 2023.[8]  The letter does not contain legal argument or citations to the record or any authority.  *See* Pa. R.A.P. 2111 (required contents of appellant briefs), 2119 (requirements for argument section of briefs).  Rather, Father sets forth his account of the history of the case and accuses CYS of conspiring to remove Child and place him with the foster family without conducting any required family findings.  He asserts that he and Mother complied with all of their goals for the first 19 months of dependency and were anticipating reunification in December of 2021, only to have the case further delayed.  He contends that the bonding assessments were biased in favor of the foster family and that CYS never offered him assistance in finding stable housing.  Finally, he writes that he is no longer using illegal or prescription narcotics and is training to obtain his commercial driver's license so he can support Child.

Father's response is a combination of disagreements with the trial court's factual findings and speculative allegations not based on facts of record.  It is well-settled that we must defer to the trial court's factual findings when they are supported by competent evidence of record, as unlike this Court, which reviews proceedings based on the cold record, and the lower court reaches its conclusions often based on "first-hand observations of the

---

[8] The letter was submitted before counsel filed her ***Anders*** brief and petition to withdraw in this Court.  However, counsel had already informed Father of her intention to do so and instructed him that he should file a *pro se* response, if he wished, as soon as possible.

parties spanning multiple hearings." ***D.F.***, ***supra***. As the trial court's factual findings here were well-supported by the record, we will not disturb them. Further, we note that Father never challenged the family findings in the trial court and, at any rate, Weaver testified at the termination hearing that CYS had contacted Father's sisters about serving as an adoptive resource and they were unable to do so. Father's letter offers no basis for relief.

**D.**

Finally, after independently reviewing the record, we conclude that there are no additional non-frivolous issues that may support the appeal. ***See Yorgey***, ***supra*** (holding that the ***Anders*** procedure requires this Court to first review the issues raised by counsel and then review the entire record "to ascertain if on its face, there are non-frivolous issues that counsel, intentionally or not, missed or misstated"). Accordingly, we affirm the decree terminating Father's parental rights and grant counsel's petition to withdraw.

Petition to withdraw granted. Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/8/2023